Richard T. DeBroux, Plaintiff-Respondent,

v.

The Board of Canvassers for the City of Appleton,
Defendant-Respondent,

Timothy Hanna, Appellant. [Case No. 96–1287]

Richard T. DeBroux, Plaintiff-Respondent,

v.

Board of Canvassers for City of Appleton,
Defendant-Respondent,

Timothy Hanna, Appellant. [Case No. 96–1309]

Richard T. DeBroux, Plaintiff-Respondent,

v.

Board of Canvassers for City of Appleton,
Defendant-Respondent,

Timothy Hanna, Appellant. [Case No. 96–1335]

Court of Appeals

*Nos. 96–1287, 96–1309, 96–1335. Submitted on briefs August
13, 1996.—Decided November 6, 1996.*

(Also reported in 557 N.W.2d 423.)

On behalf of the appellant, the cause was submitted on the briefs of *I. Gregg Curry IV* of *McCarty, Curry, Wydeven, Peeters & Haak* of Kaukauna and *R.J.R. Pirlot* of Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *John C. Peterson and Mary Taylor Lokensgard* of *Robinson, Peterson, Berk & Cross* of Appleton; and *Richard A. Stack, Jr.* of *Sigman, Janssen, Stack, Wenning & Sutter* of Appleton.

On behalf of the State Elections Board, there was an amicus curiae brief by *Kevin J. Kennedy*, Executive Director; and *James E. Doyle*, attorney general, and *Alan Lee*, assistant attorney general.

Before Anderson, P.J., Nettesheim and Snyder, JJ.

SNYDER, J. Timothy Hanna appeals from a circuit court order reversing the Board of Canvassers' (the Board) recount certification of Hanna as the newly-elected mayor of the City of Appleton (the City). Upon remand to the Board, the incumbent, Richard T. DeBroux, was declared the winner by two votes. Hanna seeks reinstatement of the Board's certification in his favor or a new election.[1]

---

[1] This is an expedited appeal. *See* § 9.01(9)(c), STATS. Additionally, because the appeal concerns an election which was held in more than one court of appeals district, it was consolidated on May 9, 1996, by order of the Chief Justice of the

We agree with Hanna that the circuit court wrongly substituted its judgment for that of the Board in determining the merits of a recount procedure. The Board had determined that a number of ballots which had not been properly preserved and were cut in half should not be included in the recount. In reviewing the Board's action, the circuit court found that the Board erred by disregarding the cut paper ballots and that it should have certified the results based upon the votes as tabulated on election day by the electronic vote tabulation system. We conclude that when the circuit court found that the Board erred because it had "another option," it improperly substituted its judgment for that of the Board. Consequently, we reverse and remand the case to the circuit court with directions to reinstate the Board's original recount certification awarding Hanna the mayoral election.

The facts are not in dispute. Hanna challenged DeBroux in the March 19, 1996, City of Appleton general election. DeBroux was certified as the election winner by an eight-vote margin. As permitted under § 9.01(1), STATS., Hanna requested a recount. During the recount procedure, the number of votes previously certified changed. In order to understand the recount procedure and the changes which occurred as a result of it, we begin with a description of the voting system used in this election.

At our invitation, the State Elections Board (SEB) filed an amicus curiae brief in clarification of Wiscon-

Wisconsin Supreme Court and assigned to District II. *See* § 9.01 (9)(b).

sin's voting law and procedures.[2] The SEB brief relates the following general voting method information:

> There are three methods of voting in Wisconsin: paper ballots, lever machines and electronic voting systems. The State Elections Board has approved three different types of electronic voting systems . . .: punch card, marksense and direct record.

The SEB identifies the City voting method as the marksense electronic voting system. The marksense's primary components are the ballots, an automatic tabulating device and computer-generated printouts.

The marksense ballot contains a caption, voting instructions, the names of candidates, offices and referenda, and is completed by hand. The directions on the ballot indicate that two ends of an arrow are to be connected across from the name of the desired candidate. The completed ballot is then fed into an electronic tabulating machine which optically scans the markings made by the voter and records the vote.

Within this system, undervotes may occur. A ballot is designated an undervote when the tabulating machine records its acceptance of a ballot, but fails to record a designated vote.[3] After the recount was com-

---

[2] A court of appeals order dated August 20, 1996, was issued pursuant to RULE 809.19(7), STATS. We appreciate the additional clarification provided by the SEB.

[3] Undervoted ballots can ultimately have one of three results. First, an examination of the undervoted ballot may show that it contained no vote for mayor. Second, it may be a ballot unreadable by the machine, but the Board is able to discern voter intent and thereby casts a vote not previously recognized by the earlier tally. One example is when a voter circles a candidate's name rather than connecting the arrow. Finally, a ballot may contain markings which do not indicate

pleted in seventeen of the eighteen voting districts, the Board was able to discern voter intent on 18 ballots which had been uncounted by the tabulating machine. *See* § 5.90, STATS. These votes were added to the total.

When the number of ballots was compared to the number of votes registered on the electronic tabulating machine for District 16, it was discovered that the total votes recorded by the electronic tabulation system did not match the number of paper ballots taken from the secured boxes. *See* § 7.51(3), STATS. It initially appeared that as many as 200 ballots were unaccounted for. After further investigation, a check was made of a box of unused ballots which had been returned to the printer for recycling. All of the ballots in the box had been cut in half and held unsecured at the print shop. An examination of the box revealed that in addition to unused ballots, it contained ballot halves that "appeared to be voted or initialled." These were removed and the top half of any used ballot was placed in a separate box; the relevant halves of 155 ballots were thus secured.

The Board then met to make a decision on the recount in light of the discovery of the unsecured portions of ballots at the print shop. The Board determined that "due to the condition of the ballots found at Custom Printing, the fact they were unsecured for over one week, and that the number of undervoted ballots for

---

voter intent. In such cases, no vote is recorded. As an example of this process, one of the wards reported the number of ballots cast as 536. However, the number of votes in that ward for mayor totaled 525. Therefore, 11 ballots contained undervotes. On recount, it could be determined by the Board that 3 of the undervotes that could not be read by the machine had in fact included a vote for a particular candidate. The Board then recorded those additional 3 votes for a total of 528 votes cast.

District 16 were not fully accounted to be able to discern voter intent,[4] it was agreed that only the ballots currently in the City's possession should be used for the recount." After counting the remaining 880 ballots in its possession from District 16, the Board declared Hanna the winner of the election with 7298 votes to DeBroux's 7284.[5]

DeBroux appealed the Board's decision to the circuit court. *See* § 9.01(6), STATS. After hearing the evidence the Board had before it,[6] the circuit court held:

> Having found an explanation for the missing ballots . . . the Board had, in my judgment, available other obvious options open to it to reflect the will of the electorate in District 16. The tally sheets subscribed to by the ballot clerks, the testimony before the Board and their findings based upon the record disclosed irrefutable credible evidence that the electronic voting system and the tally on that night, on the night of the election rather, were totally accurate and afforded the Board, in the opinion of the Court, a snapshot in time upon which it could rely to give full force and effect to the will of the voters.

The circuit court then ordered the Board to amend the recount so as to reflect the court's ruling. With this change in the recount procedure, the winner of the

---

[4] When tabulating ballots on election night, the machines in District 16 recorded 11 undervotes.

[5] The final tabulation revealed that because of the Board's decision, 157 paper ballots were not included in the recount.

[6] A circuit court has authority to receive evidence not offered to the board of canvassers under certain circumstances. None of those circumstances were present here. *See* § 9.01(8), STATS.

election was DeBroux by two votes.[7] Hanna now appeals.

The Board is the trier of fact and its findings will be upheld if supported by substantial evidence. *See Logerquist v. Board of Canvassers,* 150 Wis. 2d 907, 918, 442 N.W.2d 551, 556 (Ct. App. 1989). If the Board's determination depends on any fact found by it, a reviewing court may not substitute its judgment as to the weight of the evidence. *See* § 9.01(8), STATS. The court shall separately treat disputed issues of procedure, interpretations of law and findings of fact. *See id.*

The principal dispute in this case concerns the Board's determination that the unsecured cut ballots which were found at the print shop *during the recount* should not be counted. Several statutory sections are instructive with regard to this determination.

We begin with the scope of the election statutes. It requires that chs. 5 to 12, STATS., "shall be construed to give effect to the will of the electors, if that can be ascertained from the proceedings." Section 5.01(1), STATS. Chapter 9 is entitled "Post Election Actions" and includes the procedures to be employed when a recount is requested. Section 9.01(1)(b)10, STATS., specifically provides:

> Recounts at polling places utilizing an electronic voting system in which ballots are distributed to electors *shall be performed in accordance with the procedure for recounting paper ballots* insofar as

---

[7] The court's decision required the Board to use the votes tabulated by the electronic machine in District 16 on the election day and to disregard the paper ballots. This also resulted in the Board disregarding the 11 undervotes, which could not be examined.

applicable, except as provided in s. 5.90.[8] [Emphasis added.]

The procedure for recounting paper ballots requires that the Board "shall then examine the container or bag containing the ballots to be certain it has not been tampered with." *See* § 9.01(1)(b)3. After the container has been inspected, it is opened and the contents removed. Section 9.01(1)(b)4.

Subdivision 4 then includes detailed directions on how to reconcile a discrepancy when the number of ballots in the box *exceeds* the number of voters. This includes the elimination of defective absentee ballots, checking for blank ballots and removing any ballots not initialed by two inspectors. *See id.* If after taking these steps the number of ballots still exceeds the number of votes, the Board is required to randomly remove a number of ballots in order to reconcile the number of votes with the actual number of paper ballots to be recounted. *Id.*

However, when the number of ballots and voters agree or, as here, the number of voters exceeds the number of ballots, another procedure is mandated. Section 9.01(1)(b)5, STATS., provides:

[8] Section 5.90, STATS., provides:

Except as otherwise provided in this subchapter, recounts of votes cast on an electronic voting system shall be conducted in the manner prescribed in s. 9.01. If the ballots are in readable form, the board of canvassers may elect to recount the ballots without the aid of automatic tabulating equipment. If the board of canvassers elects to use automatic tabulating equipment, the board of canvassers shall test the automatic tabulating equipment to be used prior to the recount as provided in s. 5.84, and then the official ballots or the record of the votes cast shall be recounted on the automatic tabulating equipment.

> When the number of ballots and voters agree, or after noting that the number of voters exceeds the number of ballots, *the board of canvassers shall return all ballots to be counted to the ballot box and shall turn the ballot box in such manner as to thoroughly mix the ballots. The recount shall then begin.* [Emphasis added.]

When the Board discovered that the paper ballots from District 16 did not match the number of votes tabulated on the electronic voting system, an investigation was initiated. Because of the number of ballots missing, the investigation centered on the procedures followed to secure the ballots. It was determined that a box of unused ballots which had been returned to the printer for recycling should be examined.

The examination of the unsecured box revealed that it contained both initialed and unused ballots, but all of the ballots in the box had been cut in half. After removing all of the ballots which appeared to have been voted or initialed, the Board noted that 64 of the cut ballots were from Ward 33, and 91 were from Ward 34, for a total of 155.[9] The Board placed the relevant halves of the cut ballots in a sealed and marked box and returned the box to the vault area of the city clerk's office.

The Board then met to make a decision on the recount. The Board received an opinion from the city attorney regarding recount procedures when electronic tabulating equipment is used. Attorneys for each of the candidates presented statements on the events of the recount.

The Board noted the condition of the ballots found at the print shop and the fact that they were unsecured for over a week. The Board concluded that based on the

[9] District 16 was comprised of Wards 33 and 34.

foregoing, as well as the fact that it was unable to discern voter intent on the undervoted ballots for District 16,[10] only the ballots currently in the City's possession should be used for the recount.

■

We conclude that the Board followed the proper procedure in conducting the recount. The Board used the statutory guidelines in making its determination that only the secured ballots should be included in the recount. The Board's decision recognized the statutory mandate that it must "give effect to the will of the electors, if that can be ascertained." *See* § 5.01(1), STATS. The Board determined that only the preserved ballots could accurately be used to discern voter intent. The Board is the trier of fact and its findings will be upheld when supported by substantial evidence. *See* *Logerquist*, 150 Wis. 2d at 918, 442 N.W.2d at 556.

The circuit court disagreed and found that the Board's decision to disregard the compromised ballots and the record of votes on the electronic tabulating machines indicated that "[i]t did not avail itself of the available credible evidence, irrefutable credible evidence to indicate what the total vote in District 16 was." The circuit court concluded:

> I am satisfied as I have stated that the Board had another option available to it on . . . their recount and that option was to . . . accept the evidence of the

---

[10] Approximately 14 ballots had been separated for hand counting. Some of these ballots appeared to be unvoted ballots, while some were questioned due to pencil marks or other irregularities. However, without the ability to retabulate all of the paper ballots cast in District 16, it was unclear how many of the 11 unvoted ballots registered by the machine the night of the election were accounted for.

tally that was furnished by a machine that had not malfunctioned . . . .

The circuit court then reversed the Board.

The fact that the Board may have had "another option" available to it is immaterial. As we outlined above, the Board's actions reflected a proper application of the statutory guidelines for a recount. The Board gave substantial, credible reasons for its decision to disregard the unsecured cut ballots. "[T]he court may not substitute its judgment for that of the board of canvassers as to the weight of the evidence on any disputed finding of fact." Section 9.01(8), STATS.

DeBroux seeks affirmance of the circuit court's reasoning and argues that the Board erred when it completed the recount without utilizing the voting result recorded by the electronic tabulating system. He maintains that Hanna has a burden to demonstrate that the electronic record of votes cast is incorrect because he seeks to change the recorded result. DeBroux bases this requirement on the following language: "The burden of demonstrating that a vote total shown on a machine or record of votes cast is incorrect rests with the party seeking to change the recorded result on the basis of clear and convincing evidence." *See* § 9.01(1)(b)8m, STATS. He then extrapolates, "The result recorded by the electronic voting system is presumptively correct, [because] Mr. Hanna has not proved by clear and convincing evidence that a material error occurred."

DeBroux's claim that Hanna has not met his burden (to show that a material error occurred in the tabulated results) misconstrues the nature of Hanna's challenge to the election results. Hanna requested a recount, which he is permitted to do pursuant to § 9.01(1)(a), STATS. A candidate requesting a recount is

only required to specify that he or she "believes that a mistake . . . has been committed in a specified ward or municipality in the counting and return of the votes . . . ." *See id.* Hanna did not then, nor does he now, claim that the electronic voting system malfunctioned.

Evidence from the other districts, however, clearly illustrates that the precision of the vote tally by electronics is dependent upon multiple factors. The recount in the other districts had already resulted in an additional 18 votes being credited to one candidate or the other. The Board determined that because the machines used in District 16 had tabulated 11 undervotes the night of the election which the Board could not verify, the appropriate procedure was to recount only the actual ballots in its possession. *See* § 9.01(1)(b)10, STATS.

The burden specified in § 9.01(1)(b)8m, STATS., is pertinent only if the challenging candidate seeks to change a result based on a claim that a voting machine or vote tabulation system malfunctioned. Hanna does not challenge the election results on that basis. Furthermore, it was evident through a comparison of the number of votes tabulated with the number of ballots read by the machine that it was unlikely that the electronically tabulated results represented the true count of the votes on election day. The tabulating machines in District 16 had recorded 11 undervotes. In cases where an electronic tabulation system is used, the paper ballots become the primary means of checking the accuracy of the vote tabulation by the machine. Only by identifying and examining any undervotes to discern voter intent can a complete count be done. Because of the condition of the unsecured ballots, that examination was impossible.

In sum, we reverse the circuit court. The circuit court substituted its judgment for that of the Board. As the SEB notes in its brief, the statutory scheme for a recount "places a premium" on the Board's judgment to give effect to the will of the electorate. We are satisfied that the Board's actions complied with the statutory mandates for a recount, and we conclude that substantial evidence supports the Board's decision to recount only the uncompromised ballots. We remand with directions to reinstate the Board's certification of Hanna as the winner of the election.

*By the Court.*—Order reversed and cause remanded with directions.